*In re* MARK ANTHONY JOHNSON, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* DOUGLAS ROGERS *et al.,* Respondents-Appellees.—(LUTHERAN CHILD AND FAMILY SERVICES, Intervenor-Appellee).)

First District (5th Division)   No. 76-759

Opinion filed November 4, 1977.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Dorothy Kirie Kinnaird, and Lawrence Spector, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellees.

Haffner, Grow, Overgaard & Berghoff, of Chicago (Mitchell J. Overgaard and Craig L. Hlinka, of counsel), for intervenor-appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Lutheran Child and Family Services (Lutheran) initially brought this action seeking that Mark Anthony Johnson be adjudged a ward of the court (Ill. Rev. Stat. 1975, ch. 37, pars. 702—4, 702—5, 704—8) and that a guardian be appointed with the power to consent to his adoption (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1D(b), (d), (k); ch. 37, par. 705—9). After a hearing, Mark was adjudicated a ward of the court and a guardian appointed for his care and placement. The trial court, however, denied

the petition insofar as it requested that such guardian be empowered to consent to Mark's adoption, and it is from this portion of the trial court's order that the State[1] appealed. Lutheran was permitted to intervene and has filed a separate brief here.

Mark was born on March 12, 1975, and five days later his mother, Sabrina Johnson, after reading and stating that she understood its terms, executed a final and irrevocable surrender for purposes of adoption in favor of the Cradle Society (Cradle), a licensed child welfare agency. The document was couched in statutory terms (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—10(c)) and was signed in the presence of the hospital's social worker and a social worker of Cradle, Marlene Jackson (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—10(I)). Since March 17, 1975, Mark has been cared for in an adoptive home.

Douglas Rogers, who at all relevant times purports to be Mark's father, learned of his son's birth on March 13, 1975. Sabrina notified Douglas that she and Mark were in Booth Memorial Hospital and encouraged him to visit them. She had included Douglas's name on the visitor's list; however, her mother subsequently removed his name from the list. Sabrina testified that only those who were so listed were allowed to visit. While en route to the hospital, Douglas became lost and telephoned the hospital. Although he was not allowed to testify concerning the name of the person he spoke to or the substance of the conversation, Sabrina testified that he reached her by phone and that she informed him that her mother had removed his name from the visitor's list and that he was no longer allowed to visit her. Douglas then returned home and made no further attempts to visit Sabrina or Mark during their stay at the hospital.

Within two weeks to a month after Mark's birth, Sabrina told Douglas that their child had been placed for adoption and gave him Ms. Jackson's telephone number. In May, he made unsuccessful attempts to contact Ms. Jackson and finally spoke to her by phone on August 12 and told her he sought the return of his son. On August 18, Douglas and his sister met with Ms. Jackson. During this meeting, he announced his intention to contest the adoption and, in response, was given the telephone number of Legal Aid. When he called that number, asking to speak to an attorney regarding his son, he was in turn given the telephone number of another agency. He then called that number several times to no avail.

Prior to or at the time of the execution of the surrender, Cradle had been notified by Sabrina that Douglas was the child's father, and Ms. Jackson testified that she sent two letters to him which were returned undelivered. She made no further attempts to contact him, and the social

---

[1] Although Lutheran filed the petition, the State entered the case in the trial court by joining Lutheran in a motion after judgment.

worker from Lutheran made no effort to do so.

At the time of the hearing, Douglas testified that he was 17 years old; that he was attending high school; and that when he and Sabrina graduated from high school, they intended to marry. He further testified that his failure to visit Mark was the result of rebuffs from hospital personnel and Ms. Jackson.

The trial court adjudicated Mark a ward of the court and appointed Richard Laymon of the Illinois Department of Children and Family Services (DC & FS) as his guardian for care and placement. It was also ordered that Sabrina and Douglas have visitation rights, which they exercised during the period between adjudicatory and dispositional hearings.

OPINION

■■■ The sole issue presented for review is whether the trial court erred in denying the guardian the power to consent to Mark's adoption. Once a minor has been adjudicated a ward of the court based upon findings that he is neglected or dependent and that wardship would be in the best interests of the minor and the public, the court proceeds to an adjudicatory hearing. (Ill. Rev. Stat. 1975, ch. 37, pars. 704—1, 704—6, 704—8.) If it is determined that placement with his natural parents is not in the best interests of the minor and that he would receive appropriate care with another, the court may decide to place him with the DC&FS for care and placement. (Ill. Rev. Stat. 1975, ch. 37, pars. 705—2, 705—7.) When this is accomplished, the court should then appoint such agency as legal custodian or guardian of the person of the minor (Ill. Rev. Stat. 1975, ch. 37, par. 705—7), which is defined in another section as follows:

> " 'Guardianship of the person' of a minor means the duty and authority, subject to residual parental rights and responsibilities, to make important decisions in matters having a permanent effect on the life and development of the minor and to be concerned with his general welfare. It includes but is not necessarily limited to:
>
> (a) the authority to consent to marriage, to enlistment in the armed forces of the United States, or to a major medical, psychiatric, and surgical treatment; to represent the minor in legal actions; and to make other decisions of substantial legal significance concerning the minor;
>
> (b) the authority and duty of reasonable visitation, except to the extent that these have been limited by court order;
>
> (c) the rights and responsibilities of legal custody except where legal custody has been vested in another person or agency; and

(d) the power to consent to the adoption of the minor, but only if expressly conferred on the guardian in accordance with Section 5—9." (Ill. Rev. Stat. 1975, ch. 37, par. 701—11.)

To obtain a further dispositional order which grants to the guardian the power to consent to adoption, in addition to the authority and rights heretofore mentioned, it must be established by clear and convincing evidence that the parents irrevocably consented to such a grant of power or that they are unfit. Ill. Rev. Stat. 1975, ch. 37, par. 705—9; *In re Moriarity* (1973), 14 Ill. App. 3d 553, 302 N.E.2d 491.

"D.'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:

* * *

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to a child's welfare;

* * *

(d) Substantial neglect of the child if continuous or repeated;

* * *

(k) Failure to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a newborn child during the first 30 days after its birth." (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1D(b), (d), (k).)

The court may consider whether the termination of the parent's residual right to consent to adoption is in the best interests of the minor *only after* a finding of parental consent or unfitness. (*In re Adoption of Burton* (1976), 43 Ill. App. 3d 294, 356 N.E.2d 1279.)

"[I]n determining whether * * * parental unfitness was proved by clear and convincing evidence, we bear in mind that the trial court's finding should not be disturbed unless it is contrary to manifest weight of the evidence [citation]; that the credibility of witnesses is a matter we must leave to the trier of the facts [citation]; and that reviewing courts of this State insist that a clear case establish the statutory ground for termination of parental rights before the best interests of the child or children can be considered [citation]." (*In re Jones* (1975), 34 Ill. App. 3d 603, 607-08, 340 N.E.2d 269, 273.)

In numerous cases involving the question of the termination of parental rights based upon the "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1D, it is the intent to establish and/or maintain contact with the child rather than actual contact which is determinative

where attempts to see the child have been frustrated. (*In re Taylor* (1975), 30 Ill. App. 3d 906, 334 N.E.2d 194; *In re Overton* (1974), 21 Ill. App. 3d 1014, 316 N.E.2d 201; *In re Deerwester* (1971), 131 Ill. App. 2d 952, 267 N.E.2d 505.) We can see no reason why this interpretation should not have equal applicability to cases, such as the one before us, where fitness or unfitness is to be ascertained based upon an inquiry into the existence of a reasonable degree of interest within the first 30 days of life of a newborn child.

Here, although Douglas attempted to see his child, his name was stricken from the list of eligible visitors, and he was told he would not be allowed to visit. Sabrina informed him that the child was being cared for in an adoptive home, the location of which was not given to him. He was also informed that seeing Mark was not in the boy's best interests. Douglas's initial attempts to reach Ms. Jackson were unsuccessful. When he did contact her in August 1975, he said that he was coming to pick up Mark and was told he would have to take legal action to do so. Later, when he met with Ms. Jackson, he was again told that the child was in an adoptive home; that he could not visit him; and that his only means of redress was to seek the assistance of Legal Aid. Ms. Jackson gave him the phone number of Legal Aid but referred him to no specific attorney. Whomever he reached by telephone at this number referred him to another agency, where he was unable to obtain assistance. These facts show a decided persistence on the part of this 16-year-old father in dealing with the complicated rules and procedures of numerous agencies. While we find no indication of any concerted attempt among the persons and agencies involved to thwart his efforts, it does appear that little was done to assist him. Nonetheless, he continued in his efforts to see his son and, at the time of the proceedings in the trial court, he expressed the intent to obtain a high school degree and thereafter to marry Sabrina. Moreover, after the trial court ordered that he be allowed visitation rights outside of the adoptive home, he did in fact visit his son.

The State and Lutheran rely heavily on the fact that during the first 30 days of Mark's life, Douglas failed to visit him, to make a demand upon Ms. Jackson to be allowed to see him, or to contribute to his support. We find this argument unpersuasive. During this period, he intended to and did attempt to see his son when he was informed of Mark's whereabouts, but was turned away and told it was not in Mark's best interests that he persist. Later, he was apprised of the fact that a licensed child welfare agency had placed Mark in an adoptive home, but he was not informed of its location. As the courts and society in general rely upon such agencies to place wards in homes where they are expected to receive proper care, we see no reason why a 16-year-old father may not also entertain the same reliance, particularly since he had been refused the opportunity to see his

child. Furthermore, the State has introduced no evidence that Douglas, as a 16-year-old high school student, was financially able to contribute to Mark's support had the opportunity been given him to do so. Moreover, we find it notable that during the first 30 days and thereafter, Douglas at all times admitted paternity.

■■ Considering the totality of the circumstances and applying the standard that unfitness must be established by clear and convincing proof, we cannot say that the failure of the court to find Douglas unfit was against the manifest weight of the evidence. (*In re Jones.*) In the absence of such finding, the court properly refused to grant the guardian's consent to adoption. *In re Adoption of Burton.*

■■ Regarding Sabrina, there is no question that the surrender she executed irrevocably gave her consent to the appointment of a guardian with power to consent to adoption; however, before such a guardian may be appointed, the court must likewise give its consent (*In re Kerwood* (1976), 44 Ill. App. 3d 1040, 359 N.E.2d 183), which it did not do here. Because a guardian with the power to consent to adoption "cannot serve in lieu of one parent and not in lieu of the other," the trial court did not abuse its discretion in withholding its consent as long as Douglas's residual parental rights were not terminated. *In re Sims* (1975), 30 Ill. App. 3d 406, 332 N.E.2d 36.

For the stated reasons, the judgment of the circuit court is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.